SFX & SILENCE There you go SFX &levitating Ah they like that SFX & Levitating Isn't he out of time? Are you conceding that he could get tolling if he went back now? I've seen that argument used. Are you? But it's sort of like if you say, he should have done this, and then we tell him to go do that, and then he does that, and then you come back and say, well, you're out of time now,  I think that's a good argument. If you're asking for a certain remedy and say, well, he can go back and exhaust his administrative remedies, but if that's a pointless act, then why should we order him to do that? I understand your point, Your Honor. This is a little bit of an odd case because generally where it comes up, where inmates don't exhaust previously was where monetary damages were not available. Let me ask you. Monetary damages might be available here? No, they would not be available. And that's the situation when I'm talking about where plaintiffs have brought cases. Can't get any damages for this? He has a state court claim, and I believe it was rejected. So that gives him the right to sue in court. If I could just make one other point. He's refiled this case in state court.  This case is currently pending in Solano Superior Court. But why won't the state successfully argue before the Solano County Superior Court judge that the case should be dismissed because it was untimely filed? The case isn't assigned to me. That was the reason when you were asking. Counsel, you're here on behalf of the state in this case. I mean, you have an obligation to know what this case is about. No, no. Okay. How can I answer your question? I'm not dodging it. Well, it's a very simple question. I mean, is the state now going to move to dismiss Mr. Irby's Solano County Superior Court action on the grounds that he's out of time? My understanding was because this case has been brought three times, there's a sexual limitations problem. Right. Okay. So he's out in Solano County, and if we deny his appeal in this case because he failed to exhaust his administrative remedies, he's out on his Federal 1983 action, that's the end of Mr. Irby's litigation, isn't it? Seemingly, it would be. Okay. And on that point, if there's no other questions on your case. Well, I am just – really, I must say, I find this a very troublesome case. Your argument, if we forget about that, if we go on to the – Sure. Let me just cut to it. Your position is that he should not have filed his complaint at the first level administratively. He should have gone directly to the second level. I have looked, and you said this funny phrase about shall be waived, that you – or something like that. What I have looked all through this, and I can't find anything that tells him that if his complaint is against a corrections officer, that he's not supposed to use the first level. Okay. On that issue, when you say the first level, you're talking about the informal level. Yeah, the informal level. Okay. The district court talked about that. There was the departmental staff complaint exception, and the district court said the plaintiff should have gone directly to the first level. And so – but, you know, the other thing I want to point out is – Well, why – what in the record told him that that's what he should have done? Well, because it was a complaint against staff. Staff misconduct presumably would – Well, but he's sort of saying, hey, I gave – the appeals coordinator is the same person. I go in, I give him my complaint against a staff, and then, I mean, he's saying, and I guess it's disputed that it got lost and they didn't do anything about it. You're saying he misfiled it or something along those lines, but – There were two things in this case. He filed the second appeal on – the first one was – I'm sorry, April 2, 2008. Well, what happened to the first one that he said he filed? Did you guys lose that? We have no record of it. And the problem – and I don't think there's any disagreement. There's no – What do we do with that? You're not challenging his statement that he filed it, are you? Well, the problem that arises is we have no way to track it. So he could say he filed it. I'm not calling anyone a liar, but he can say he filed it. We don't have any record of it. I asked my client, who at the time was out on a fire line. He said, I never received anything. So – but he – the thing is he refiled – he filed a second inmate appeal. It was processed timely. It's – I find it hard to believe there's a conspiracy. The fire captain won't answer. Well, why don't you just take us through the facts as you understand them? Okay, Your Honor. Essentially, the argument I would make is he had an obligation to start at the formal level. Wait a minute. If he filed at the informal level, he says you have no record of that. That's correct. But it was not – so he never got anything back saying it's denied, clearly, because you say you don't have any record of it. Now, what happened after that? After that, the plaintiff's allegation is that he went to the appeals coordinator. Again, we have no record of that. And what we do have a record of is the May 26, 2001 appeal, which was five or six weeks later. That was to? That was directed to the appeals coordinator. Pardon me. And it was timely processed. And, in fact, he tried to go to the third level. He didn't have his documentation. And what was he told? It was processed, and what was he told? It was returned to him from the third level because not all the documentation was attached. There was a skip form and then the second-level response. And the plaintiff's response to that is, well, I was out getting medical treatment and I believe he said he received it a few days later, but he could have then even returned it. There are exceptions for if he was out on medical treatment, didn't get it timely. So he could have gone forward with that claim. It was processed and he was told it was insufficient. It was insufficient because he didn't attach the – and he was told how to cure it. And he didn't cure it? My understanding was he didn't cure it. But in any event, because he would have to exhaust administrative remedies prior – fully prior to filing his case, the McKinney case. What exactly is the remedy? I just – what exactly is the remedy that he should have pursued? He should have. In these circumstances, it's very, you know, it's very convoluted. If you find that the second appeal related – the district court, by the way, said it didn't. It didn't have the allegation of misconduct against my client. But if you did believe that that second one did, he should have properly processed it. He should have attached the second-level response, which is in the record, and he should have returned it, along with the SCIF report. He was also pursuing a worker's comp claim. So he didn't go – he didn't do that, and that's where he didn't exhaust? Is that what you're saying? I don't know at this point if he ever – Can you point to me in the excerpt where I find where he was told that he should  Sure. Thank you. Thank you. Your Honor, the – there was not – this was not – the plaintiff did not attach an excerpt to the record. Nevertheless, in his opposition, I could give it to the clerk and she'll hand it to you. It discusses – He has it. You don't have it.       I don't have it. I don't have it. I don't have it. I don't have it. Then we'll leave the excerpts of record with me. You came to oral argument without your excerpts of record? I'm sorry, Your Honor. Don't do that again. I'm sorry. Well, I've looked through it and I can't find it. You're saying that he – that he has attached what you're relying on? He's attached it to his opposition, which I – I don't know that there's any disputed … Where is it? It's his Exhibit 1.2. It's attached to what? His opposition? His opposition to the motion for summary adjudication. In the … Before the district court. Okay. Any further questions? I'm out of time, so … Thank you. Thank you. Mr. Irby. In that second appeal that's in question that he's saying, he just stated that the court found that that appeal didn't relate to this matter because I didn't allege the conduct. So there was no need. I was asking for an investigation report, something that wasn't related to the actual incident, so there was no need for me to exhaust that. You know, my first appeal that I filed was the one that I needed to exhaust, the one that they never responded to. Now, the one that he just stated, the court found that that wasn't even related to the incident, you know, because I didn't allege the conduct. So, therefore, that appeal has no relevance to this proceeding here. Mr. Irby, in terms of the time, okay, you filed the first one. Right. And then how long did you wait before you went and told them, hey, I haven't heard anything? Well, after I filed the first one, I filed it and I alleged the misconduct on behalf of Coolidge. Okay. Okay, I never got a response. So then I started my own investigation. I wanted to, I knew because people Okay, so did, so you, so that's when you filed the second one, asking for investigation? Right. It was totally separate. It wasn't for his misconduct. I wanted an investigation report so I can do my own investigation and get into the, you know, find out what's going on with the case, you know, what did they have and I knew that I was aware because inmates were coming back on medical once they transferred me. They were coming back saying that they had an investigation. They took an investigation of the What proof do they usually give you of filing when you file? You get a log number. Within a period of five working days, you get back a log number so that way You didn't get a log number. I didn't get nothing. Did you ask them about that? Yes, I sent inmate request forms in and they also went unanswered. They said they have no record and then my time for filing was past, went past the time for filing so I, you know, I went on to the next step, tried to get investigation reports and everything. I just did the best I can do at the time. I didn't have no knowledge, you know, I didn't have no knowledge of the proceedings and all I knew was to file it and I did what I had to do but it went unanswered and then I went and filed another one trying to get investigation reports and information. Okay. Did you ever have an opportunity to, were you in prison when this was before the district court? Right. So you never had an opportunity to appear before the magistrate? No. Okay. Thank you. Thank you. Mr. Irby, did you give your current address and phone number to the clerk so we can get a hold of you? I'm going down. She told me to go down there and change it. Okay. Because we need current locator information. Because if you don't fill that out, you won't get anything from the court. Right. Okay. Okay. And then that's not our fault if we don't know where you are. Right. Right. I'll make sure I do that. All right. Thank you, Mr. Irby. Thank you. Thank you, counsel. Your Honor, if I could just say one last thing. It's on page 50 for the excerpt. Here's a summary of the issues you discussed. All right. Thank you. Thank you. Case disargued is submitted for decision. We'll hear the next case, which is United States v. James Peralta. Good morning, Ms. Carr. I haven't set my time yet, Your Honor. Okay. That's okay. I'm just saying hello. It's not going to cost you any time. May it please the Court, Jason Carr appearing on behalf of James Peralta. Peralta suffered a deprivation of rights of constitutional magnitude, of the most extreme form. You know, when Mr. Peralta appeared at his arraignment and plea in front of a federal magistrate on this very charge, he was advised, as is the custom and practice in the District of Nevada, that he had certain rights. Among those rights were the rights to present witnesses, the right to testify on his own behalf, the right to a jury trial. Mr. Peralta did not receive those rights in this manner. It's important to recognize that the criminal justice system is not just outcome determinative. The appearance of justice, the appearance of due process and fair play is important before society condemns an individual to prison, before we put that moral condemnation on a defendant. In this case, there's no way Mr. Peralta or his family could have felt this conviction was fair. He was denied the right to get on the stand and tell his story. And the story was not facially implausible. The story was not factually impossible. He had a story that, if the jury believed him, would have entitled him to, at the very least, an instruction on justification and perhaps even an acquittal. Mr. Carr, are you arguing for the rule that a defendant should be allowed to put on any defense, no matter what evidence he has to support it? What does that do for the rules that basically permit the trial court to exclude from the evidence arguments on either side that simply waste time, confuse the jury, or otherwise obfuscate the issue? Your Honor, there's no doubt that the case law in this circuit is articulated in cases like Marino and Durrell. Woodford is that if the defendant's story is factually impossible, facially implausible, that he does not have the right to present that evidence to a jury. The trial court does have a gatekeeping function here. But as was – as this Court has stated before, though, that gatekeeping function is extremely limited. But the Court – the Court is not allowed to make credibility determinations. The Court is not allowed to evaluate the strength of the proffer. The Court can only say, this is a factually impossible scenario the client is running. Or if I believe his factual proffer, that it doesn't support the elements of the defense as a matter of law. There's no doubt that the Court has that gatekeeping function. But in this case, our argument is his proffer did indeed meet the elements. They could have – the district court could have believed that they were weak and substantial, tenuous. Not to be believed, that doesn't matter. That's not the trial court's problem. As the Supreme Court has said many times in cases like Sandstrom v. Montana, the defendant has a real constitutional right to have the jury determine – determine contested issues of fact. But under our four-part test, doesn't the trial court essentially have to satisfy itself that there is, for want of a better term, a prima facie showing of evidence to establish each of the four elements, similar to a showing that a party must make in a summary judgment motion in a civil case before we'll allow the case to go to the jury for resolution? I agree with that, what you just said. The Court must make – see if there's a triable issue of fact on each of the four elements. You know, the facts – if a defendant came to court and said, my defense is going to be that little green man came from Mars and stuck the gun in my pocket, well, that's factually impossible. It's not plausible. It's not a triable issue. The Court certainly could say, no, Mr. Defendant, you're not allowed to present that. Well, isn't that – isn't that what the trial judge did when Judge Hunt said, for example, with respect to the third element, I find that Mr. Peralta failed to pursue reasonable legal alternatives? He could have left the scene or he could have called 911 to summon the police in order to quell the situation with his brother. And isn't that what the trial court did in this case? But, Your Honor, it's different in kind. Because with Peralta, he didn't submit to the trial court a factually implausible, ridiculous story. I mean, what the Court just talked about, those are classic issues that the jury should have been able to determine. Because his proffer was, I never had – this was a rapidly unfolding exigent situation that his brother was reaching for this gun in the toolbox. He stopped it. And we have great facts here about the – I understand that. The part of this that – well, just explain the facts as you understand them. He stopped his brother. And then what did he do? Well, he – the proffer, which is assumed to be true, is that he was – his brother, who has previously been institutionalized as violent, psychotic tendencies, was in an argument with him, punched Mr. Peralta, started threatening him with physical harm. He looked into the tool – his brother started looking in the toolbox and reaching toward it. And James saw what he was going for, saw there was a gun in there – and incidentally, his dad would have testified, I keep a loaded gun in the toolbox – that he grabbed the gun and tried to call – to keep it away from Richard and tried to calm him down, talk to him, defuse the situation, and eventually got Richard to go inside the residence. But then doesn't the evidence also show that he put the gun in his waistband and then went out and worked on his motorcycle? He did, Your Honor, but – So when the – so then when the people came, the probation officers, whoever it was – The officers. He was working on the motorcycle with the gun in his belt. Right. And I would concede that that fact right there is the weakest fact we have in this case. Right. But it's just exactly – it's sort of analogous to what happened in Newcomb. First of all, the proffer that was given is that the cops came within minutes after this altercation. Within four minutes is what the proffer says. What James Peralta, through his proffer, said was that, I did not feel like I had a safe place to stash the firearm. That I believe my brother, even though he momentarily retreated into the house, still posed a continuing threat not only to myself, but to himself and to these neighborhood children who he may have just sworn at, you know, a few minutes beforehand. Would it have made a difference if the evidence had shown that he'd unloaded the weapon? Well, Your Honor, that would – that's something that a jury could say, well, that would have been a reasonable thing for him to do. And that the jury could have said it wasn't reasonable for him to think that Peralta was still a threat and keep the firearm, that he should have taken some other course of action. But doesn't the jury, as the conscience of the community, isn't that really their determination to say, well, Mr. Peralta believes that what he did was reasonable. We don't agree, as 12 members of the State of Nevada, as members of his community, that what he did wasn't reasonable. And this isn't – and one thing I really want to stress to this Court is this isn't the type of case that this Court talked about in Woodford, which is when a felon arms himself in advance of a crisis. When he has these vague threats around, he arms himself and he keeps a firearm for a protracted period of time. This is a case different in kind from that. What were the facts in terms of did your client have an opportunity to leave? That's a contested issue, a fact that would have been a great thing for the jury to have decided. But what was the – what were the guidelines of the period of the – that the Court had in terms of how long was it before from the altercation to when the probation people came? They weren't probation people. They were police officers. Police officers. Four minutes. A very protracted – not protracted. Excuse me. The opposite. A very protracted period of time. Contract. We knew what you meant. That this was the proper and that Mr. Peralta, even though he was trying to figure out what to do with the firearm, he didn't believe – he believed his brother still posed a threat. He was waiting for his father to come home or some other reasonable way to get rid of the firearm. And what the Court needs to focus on and what the case law says is when you have a situation, you have to look, first of all, at the time of possession, when he first took possession. There's no question under our proffer that at the time of possession, there was an eminent threat. Now, which is much different from cases like Phillips and Woodford where the defendant armed himself in advance of some supposed crisis. There was no threat at the time of the possession in those cases. The second thing the Court needs to look at is, well, did he dispose of the firearm within a reasonable time after the threat had abated? Our proffer is the threat was still there. That Richard Peralta was not secreted away into some fortress. He had not left the area. He was right there in the house. He could have come out of the house at any time, and that's what James believed. And that was his proffer. But unloading the firearm would have alleviated that problem. Well, Your Honor, first of all, it was a clip that's in the gun. Maybe he didn't know how to unload it. We don't know. And there's an important point here is that there are evidentiary gaps here because he never was able to testify and tell his whole story. His dad wasn't able to testify and present his exculpatory material. There are evidentiary gaps in this record. We don't know if Peralta knew how to unload the firearm. Those are things that must be construed in favor of James. Well, couldn't have that been in the offer of proof, that he didn't know how to unload it? Well, Your Honor, you'd have to anticipate every single factual dilemma that would come up. And these are things that the jury, 12 angry men, would have been able to deliberate. Counsel, at that point in the middle of the trial, you should have been able to make a fairly detailed proffer as to what your evidence was going to be that you wanted to put on. Well, I would submit if this Court looks at the proffer, which is on here. We've read it. We've read it. I don't see anything in there about unloading or whether he knew how to unload a semi-automatic weapon. Well, his proffer was he didn't believe there was a safe place to put the weapon at the time. And even if he unloaded it and still possessed the ammo, he still would potentially be guilty, like in Newcomb, where the defendant disposed of the firearm, still had the ammo on him even after the threat had evaded him. The Court said that was okay because it was a matter of mere minutes. I'd like to reserve at least a couple of seconds for rebuttal. You have a couple of seconds. May it please the Court. Darren LaHood on behalf of the United States from the District of Nevada. At the outset, members of the Court, the government agrees that the justification necessity defense is applicable in extraordinary and rare cases. And as the Court is well aware, the Gomez case is really the benchmark case in which the justification necessity defense was used. And in that case, there were absolutely extraordinary conditions that were put in place there. And if you look at the Wofford and the Phillips case that followed both, that followed the Gomez case, they both rejected the justification necessity defense. And Gomez really, in looking at the facts of Gomez and what was put forth in that case, the level that the defendant has to reach is absolutely extraordinary. And when you look at the time frame in this particular case, and the facts are very, very important in this case, this defendant, Mr. Peralta, possessed this handgun that was fully loaded for over 25 minutes. Twenty-five minutes from the time the victim testified that he saw him wave this gun at him and his children, he put that gun in his waistband. If you look at the facts, police did not arrive there. They got a phone call at 709. They were dispatched. I'm sorry. The call went out at 709. They testified in the record that they got the call. They arrived there sometime between 710 and 715. But they met three streets away, the three officers. They met there, and they made a plan for how they were going to approach the residents there. They made that plan. They met. They essentially didn't arrive at the defendant's residence until 720, around there. So if you look at the facts, it's 25 minutes. And when they arrived there, the defendant's next to his motorcycle with that same gun in his waistband. This is a defendant that possessed this gun for 25 minutes. Did he ever try to secure this weapon? No. Did he ever try to get rid of this weapon? No. Did he ever try to unload this? No. Did he ever try to flee the neighborhood? Never. Did he ever try to call police? No. Did he ever try to go to a neighbor? Never did. Twenty-five minutes, he possesses a fully loaded handgun in his waistband. Those are the facts that are undisputed and unrefuted in the record. In looking at the four requirements that are laid out by the law. What does the record show? Who called the police? The police were called by the victim, Damon Echols, at 709. The testimony is that Mr. Echols had his children come home at 645 and, between 645 and 650 on that evening. His children report to him, the man down the street just cussed at us. He immediately walks down the street. Giving him the benefit of the doubt, let's say it's 650. He says he's only down there for two to three minutes. That's in the record. He goes down there. The defendant waves the weapon at him and his children. Puts it in his waistband. He walks back. When he goes back, he's very angry, upset. He's thinking about revenge. That's in the record. He does not do that. When you say the defendant waved. I'm sorry. I'm sorry. The victim. Well, when you say initially, you're not talking about this defendant when you're saying wave the gun. Yes, I am. You're saying this one did. This defendant waved the gun. And if you look at the record, and I'd be happy to point it out, in the record, he not only waves the gun at the victim and his children, he also utters language to them saying, I'm not going to put up with this effing stuff today. So that incident is about two or three minutes long. He walks back with his children to his residence. He's distraught and angry, thinking about revenge. He calls his sister. What should I do? Should I go after him? No. 7-0-9, he makes the phone call to police, non-emergency number. They then relay the dispatch call to police. So this is, and he leaves the defendant with the gun in the way. The victim's call has nothing to do with the defendant's brother. It has to do with the defendant himself. Absolutely. And that's clear from the victim's testimony. So we're looking at a time frame here of over 25 minutes that he does nothing but sits in front of his garage, works on this motorcycle with a fully loaded weapon. And this is a two-time convicted felon that does this. Well, part of the 25 minutes was taken up with the confrontation with Mr. Echols. Well, I disagree with that, Your Honor. If you look at the proffer and what Judge Hunt stated. You didn't listen to my question. I'm sorry. As I understand the scenario, the kids come home to tell Mr. Echols, their father, that this guy's cussing at them. Echols then leaves his house and goes down the street where he and Peralta have a confrontation. And Peralta at that point waves the gun at him and yells something about, I'm not putting up with this today. Then Peralta goes back to his house or, excuse me, Echols goes back to his house and calls 911, right? Correct. Okay. And then by the time the police get there, Peralta is calmly working on his motorcycle with the gun stuck in his waistband. Correct. Okay. And that whole period of time is about 25 minutes. Correct. Okay. But the proffer of when Peralta had the problem with his brother was relative to where? Your Honor, if you read the proffer, it's before the children come back to Mr. Echols is when the incident takes place, which is consistent with the gun being in his waistband or him having the gun when Mr. Echols arrives. So that proffer of him supposedly having this implausible story happens before 645 or 650, because he already has the gun and Judge Hunt went over that when he questioned the proffer. And so when you look at these four requirements laid out by the Lemon case and also that was looked at in Gomez, we believe that none of these four are satisfied. And the first one that is absolutely not satisfied is there was no reasonable legal alternative. Number three, as I stated, he had so many opportunities during those 25 minutes to get rid of this weapon, do something to this weapon, secure this weapon, go to police, did not do that. On the fourth element, in looking at the fact that there was no causal relationship, you've got to remember when they arrived, their police, which is in the record, the defendant was under no immediate threat of death or harm. He was sitting next to his motorcycle working on it. And if you look at the record when police arrived, he was reaching for the weapon. He was reaching for the weapon. He wasn't immediately spontaneously telling the police, oh, I just took this from my brother, I just did this. Never mentioned that. Never made any statement to police when he's arrested. Simply is reaching for the gun. He has to be put in an arm hold in order to be arrested because he's reaching for this particular weapon. So I don't believe there's any causal relationship under number four from the threatened harm that happened 25 minutes before and him possessing that gun at that time. Looking at the first rationale that is under the Lemon test, I would also argue that he was under no immediate threat or great bodily harm. When the proffer was put forth, there's no testimony in that proffer by defense counsel that the defendant's brother ever said, I'm going to kill you, I'm going to murder you, I'm going to do this, I'm going to do that. There was no evidence of that whatsoever. So looking at the first prong, number three and number four, they are not satisfied whatsoever from the facts that are put forth in this case. In looking at Gomez and looking at the extraordinary, extraordinary circumstances that were put in place. In looking at factor number two, it's a little bit ‑‑ the government could see that's probably our weakest point, but nonetheless, we believe that the defendant was not able to satisfy that factor, that he did not recklessly place himself in this situation. Obviously, Judge Hunt looked at the ‑‑ That's a stretch. I think it probably is. To say they can't go see his brother. Yeah. He has a delusional brother, whatever, to say that he can't go visit him. I would agree, Your Honor, that that's probably a little bit of a stretch, and the government could see that. But when we look really at the other three factors, there's no way the defendant can meet this threshold or burden. Mr. LaHood, how long did this case take to try? It took ‑‑ well, we did one full day, the government's case in chief, and then we got into this issue, and then they did not present a defense. So it was a day and a half. A day and a half trial. And how much time would the defense have taken to put on their evidence if Judge Hunt had allowed them to put on the justification defense? If they were able to meet this four‑prong process, Your Honor, they, as I understand it, would put on the father and also present the defendant, is the way I understood it, would testify. With direct and cross‑examination, it would probably be another day, I'm guessing, a little over a day. For two witnesses? This whole thing happened in less than 25 minutes? Well, that may be a stretch, Your Honor. Less than a day. Okay. Let me ask you, as I understand what the district court said in rejecting it, the district said it would be misleading to the jury as to its responsibilities. Is that right? Well ‑‑ It said that. What did the district court mean by that? Well, Your Honor, there's obviously a body of law that's in place here. This justification necessity defense is not without limits. And there are limits here. So I understand. I'm just wondering what the district court meant when he said it would be misleading to the jury. Well, I guess ‑‑ The defendant could have still testified, right? But he just couldn't get a justification instruction. And then if you said that, then you would have admitted the elements of the crime. Correct. I mean, the body of law is there for a reason. I mean, you know, that four‑prong test is there for a reason. And that's what the judge looked at. You know, we have this body of law. We have to abide by that. And I think that's what the judge meant by being able to say this implausible story that doesn't ‑‑ By telling the jury that it could believe something that didn't mean ‑‑ that it could accept something that didn't meet the requirements. Exactly, Your Honor. And I believe that's what Judge Hunt was getting to. Yeah. Okay. If there are no questions, I will conclude my argument. Thank you. We'll give you 30 seconds. Or a minute. The government's presentation just makes me angry. Because it's not honest. Don't get angry. Just be dispassionate. It's not honest. You know, they did the same thing in their brief. They misconstrued the record. They make all inferences in their favor. There's no evidence in this record. It was 25 minutes. He just came up here and made that up. That's not in the record at all. It's contrary to the proverb. You can read the record. Right. You know, and they also are misguiding the case law. When they did the same thing in their brief, they said, oh, this defense only pertains in extraordinary circumstances. Well, the quote that they took that little part out of says this. And this is from Woodford. The defense of necessity will rarely lie in a felon in possession case. Unless the ex-felon, not being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened. Which is exactly what happened in this case. The case law doesn't say that it only pertains to extraordinary circumstances. Instead, it only pertains to extraordinary circumstances when the defendant arms himself in advance, as he did in Gomez. And that's exactly what that quote says. And they're misstating the law. And they're misstating the facts. Another thing that they said, that he just came up here and said, is that there's no evidence that James was being threatened. I mean, that's not what the record says at all. If you look at EOR 149 and 148, he said specifically that he was being threatened verbally and his brother was reaching for a gun. So that assertion is repelled by the record. I know I'm out of time. I strongly urge this Court to reverse and remand this matter so that James Peralta can have one full and fair trial. Thank you. Thank you, counsel. Thank you, counsel. The case just argued is submitted for decision. That concludes the Court's argument in the audit this morning. The Court stands adjourned. All rise. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Schroeder, Tallman, Callahan